IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-800

 Filed: 16 June 2020

Durham County, Nos. 18 J 114-15

IN THE MATTER OF K.L., J.A. II

 Appeal by Respondents from order entered 29 April 2019 by Judge Shamieka

L. Rhinehart in Durham County District Court. Heard in the Court of Appeals 27

May 2020.

 Senior Assistant County Attorney Elizabeth Kennedy-Gurnee for Petitioner-
 Appellee Durham County Department of Social Services.

 Garron T. Michael for Respondent-Appellant Mother.

 David A. Perez for Respondent-Appellant Father.

 Christopher J. Waivers for Guardian Ad Litem.

 BROOK, Judge.

 Respondent-Mother and Respondent-Father (collectively “Respondents”)

appeal from an order adjudicating their son Joseph abused and neglected and

Respondent-Mother’s son Kenneth neglected.1 On appeal, Respondents argue that

 1 “Joseph” and “Kenneth” are pseudonyms used by the parties to refer to the juveniles in this
case.
 IN RE K.L. AND J.A. II

 Opinion of the Court

the trial court erred in adjudicating Joseph abused and neglected and Kenneth

neglected. After careful review, we reverse the order of the trial court.

 I. Background

 A. Factual Background

 Early in the morning on 29 May 2018, around 1:00 a.m., Respondent-Mother

woke up to feed three-month-old Joseph and afterward started to bounce him as she

usually did after a feeding. However, she noticed that Joseph was not putting weight

on his left leg. Respondent-Mother then woke Respondent-Father to tell him that

Joseph was “not jumping like he usually does.” Joseph was not crying, nor did he

appear to be in any distress, so Respondent-Father suggested that they wait and see

how Joseph was feeling in the morning. When Joseph woke up at 5:00 a.m., he “didn’t

seem to be in any pain,” but he still was not jumping when he was held up.

Respondent-Mother dropped Joseph off at the babysitter and checked in with the

babysitter regularly to see how Joseph was doing. The babysitter reported that

Joseph appeared to be fine, but Respondent-Mother was still concerned, so she

scheduled an appointment with his pediatrician for the following day, 30 May 2018.

 The pediatrician examined Joseph and said that his leg looked “normal to her”

and that “babies sometimes change their habits.” Respondent-Mother asked the

pediatrician if “she was sure,” and the pediatrician told Respondent-Mother that she

could order an X-ray if Respondent-Mother was still concerned. Respondent-Mother

 -2-
 IN RE K.L. AND J.A. II

 Opinion of the Court

asked for the X-ray but did not receive the results until she arrived home with Joseph.

The pediatrician called Respondent-Mother and told her that fractures had been

identified on Joseph’s legs and that she needed to take Joseph to the emergency room

at the University of North Carolina hospital. Respondent-Mother went to Duke

University Medical Center since it was closer. She called Respondent-Father on the

way and told him what the X-rays had revealed and that she did not know how the

fractures could have happened. Respondent-Father told her that two days prior, on

28 May 2018, he had placed Joseph on the couch, and, when he turned around, Joseph

had fallen about two feet onto carpeted floor.

 When Respondent-Mother arrived at Duke Emergency Center, she told the

intake nurses what Respondent-Father had told her and gave them a letter from the

diagnostic center that had taken the X-rays. The letter read that the center had

identified fractures on Joseph’s leg and that “non-accidental trauma should not be

excluded.” At the hospital, four classic metaphyseal lesion fractures were identified

on Joseph’s left and right legs, and, according to the doctors, these types of fractures

were “highly concerning for non-accidental trauma or child abuse.” Furthermore,

they were not consistent with injuries from the short fall off the couch that

Respondent-Father had reported but rather with force generated by “traction, torsion

and/or shearing of the leg.” After doctors at Duke read the X-rays, they admitted

Joseph and decided to call child protective services.

 -3-
 IN RE K.L. AND J.A. II

 Opinion of the Court

 Joseph was discharged from Duke Hospital on 1 June 2018 and placed in a

kinship placement with his paternal grandparents. On 4 June 2018, DSS filed a

juvenile petition alleging abuse as to Joseph and neglect as to eight-year-old Kenneth,

Respondent-Mother’s son from a previous relationship who lived with Respondents.

 B. Adjudication and Disposition

 The adjudication hearing began on 18 December 2018 with Judge Rhinehart

presiding. Dr. Deanna Adkins testified first for DSS as an expert in pediatric

endocrinology and offered testimony as to her treatment of Joseph during his hospital

stay. Dr. Adkins testified that she had performed an evaluation on Joseph on 30 May

2018 to identify whether Joseph had a bone disorder known as rickets because tests

revealed that Joseph was vitamin D deficient with corresponding elevated

parathyroid hormone (“PTH”) levels.2 Despite initially believing that Joseph had

rickets in his left rib, Dr. Adkins testified that Joseph did not exhibit signs of rickets.

Dr. Adkins further testified that vitamin D deficiency is common in infants like

Joseph who are exclusively breastfed.

 Next, Dr. Gary Schooler, the pediatric radiologist who interpreted Joseph’s X-

rays, testified that six fractures were identified on Joseph—two were not visible on

 2 Dr. Adkins testified that rickets is “a bone mineral problem” of which there are multiple
types. She further testified that in Joseph’s case, doctors evaluated him for “vitamin D deficiency
rickets . . . where bone is formed without being calcified at the growth plate. And so the growth plate’s
widened and that area is not as hard as the other parts of the bone because there is not the calcium in
it.”

 -4-
 IN RE K.L. AND J.A. II

 Opinion of the Court

the initial X-rays—but all were healing by the time of Joseph’s follow-up visit on 18

June 2018. Dr. Schooler testified that Joseph would not have had the ability to

generate the force to create his injuries on his own. Dr. Schooler also testified that,

at the time he interpreted Joseph’s X-rays, he was not aware that Joseph had vitamin

D deficiency or PTH issues.

 Dr. Lindsey Terrell, who worked at the Duke Child Abuse and Neglect Medical

Evaluation Clinic (“CANMEC”), then testified. Dr. Terrell performed medical

examinations of Joseph on 31 May 2018, 1 June 2018, and 18 June 2018. Dr. Terrell

collected a complete patient history from Respondents—questioning them together

and separately—to try to determine the source of Joseph’s injuries. Dr. Terrell

testified that Respondents were cooperative, answered her questions, and provided

the information that she requested. Dr. Terrell also testified that she spoke with

Joseph’s primary care provider at Chapel Hill Pediatrics, and the providers at the

practice told her they had seen Joseph for his newborn, two-week, one-month, and

two-month wellness checks and they had no concerns about him or his family.

 Dr. Terrell testified that when a child under the age of one has a fracture, it is

recommended that their whole body be assessed and their brain, skull, organs, bones,

and eyes be examined for other injuries. Dr. Terrell testified that those tests were

ordered, and there were no abnormal findings—save for the fractures in Joseph’s legs.

Dr. Terrell also testified that Respondent-Mother asked that Joseph be tested for

 -5-
 IN RE K.L. AND J.A. II

 Opinion of the Court

osteogenesis imperfecta (“OI”), another form of rickets, because OI ran in her family,

and Respondent-Mother reported that she had sustained a fracture when she was ten

or twelve merely from walking. The test was performed and ultimately came back

negative.

 Dr. Terrell testified that in her opinion Joseph’s injuries were acute and based

on the history provided by the parents, most likely occurred on or around 28 May

2018. Moreover, “it was very concerning to” her that “despite multiple times in trying

to obtain a history [from Respondents] there was no history provided that could

explain the six fractures found in [Joseph]’s legs.” Without an explanation or an

account for the force she indicated was likely necessary to cause the injuries, Dr.

Terrell opined that it was “highly probable” that Joseph had experienced some type

of physical abuse.

 Durham DSS social worker Shekinah Taylor testified last for DSS. Social

Worker Taylor testified that she was assigned to Joseph and Kenneth’s case on 31

May 2018 and that as part of her investigation she spoke with the doctors at the

CANMEC clinic. As DSS had interviewed Respondents and Kenneth the evening

Joseph had been admitted to the hospital, they were not formally interviewed again

regarding Joseph’s injuries. Social Worker Taylor testified that her role at that time

was to complete a safety plan with Respondents regarding Joseph and Kenneth, and,

once that was done, she transferred the case to another social worker on either 1 or 4

 -6-
 IN RE K.L. AND J.A. II

 Opinion of the Court

June 2018. Social Worker Taylor also testified that no bruises, markings, or

indications of abuse or injury were ever found on Kenneth. She further testified that

DSS had concerns for an injurious environment due to Kenneth’s living in the home

where Joseph’s injuries “potentially occurred[,]” which resulted in the juvenile

petition alleging Kenneth to be a neglected juvenile.

 Respondents then testified. Both Respondent-Father and Respondent-Mother

testified that they did not know how Joseph sustained his injuries. Respondent-

Mother testified that not knowing what caused Joseph’s fractures “bothers me

because if something’s wrong with him I definitely[] . . . want to know . . . if it’s, you

know a bone disease or something.” Respondent-Father testified that criminal child

abuse charges were never brought against him or Respondent-Mother.

 Following the presentation of all evidence, the trial court announced its

judgment in court on 20 December 2018, adjudicating Joseph abused and Kenneth

neglected.

 The matter then proceeded to the disposition stage.

 Social Worker Taylor testified first that she did not have any concerns

regarding Respondents’ ability to maintain stable housing or employment. Social

Worker Brianna Dearing, who was then assigned to the case, testified that

Respondents had fully complied with DSS’s recommendations and been “very

cooperative.” Social Worker Dearing testified that she had spoken with Kenneth

 -7-
 IN RE K.L. AND J.A. II

 Opinion of the Court

several times since being assigned to the case and Kenneth told her that “he doesn’t

like the fact that his brother doesn’t live in the home[,]” that he loved Respondent-

Father, and wanted to live with his mom, Respondent-Mother. Social Worker

Dearing also testified that Respondents visited Joseph daily, driving an hour and a

half each way to visit Joseph at his grandparents’ home.

 Guardian Ad Litem (“GAL”) Susan Fisher then testified about her

investigation regarding Joseph and Kenneth. She testified that she had no concerns

regarding Respondents’ interactions with both Joseph and Kenneth and that the two

children appeared to be very bonded to Respondents. GAL Fisher also testified that

she had spoken with Respondent-Father’s ex-wife of ten years, with whom he had

three children, who reported that Respondent-Father “wouldn’t hurt a fly” and that

she had “no concerns at all that he did anything to injure [Joseph].” Finally, GAL

Fisher testified that, contrary to what she wrote in her court summary, she did not

“feel that there is a danger for the children to be in [Respondents’] home.”

 On 21 December 2018, the trial court determined that it would be in Kenneth’s

best interest to remain in Respondents’ home but in Joseph’s best interest to remain

in the legal custody of DSS and in a kinship placement with his paternal

grandparents.

 -8-
 IN RE K.L. AND J.A. II

 Opinion of the Court

 The trial court’s written order was entered on 29 April 2019, adjudicating

Joseph abused and neglected and Kenneth neglected and including findings of fact

and conclusions of law for disposition.

 Respondents timely appealed.

 II. Analysis

 On appeal, Respondents argue that the trial court erred in adjudicating Joseph

abused based only on unexplained injuries. Respondents further argue that the trial

court lacked subject matter jurisdiction to adjudicate Joseph neglected because DSS

failed to properly allege neglect in the original juvenile petition, and the allegations

pertaining to abuse were insufficient to put Respondents on notice that neglect was

at issue. Finally, Respondents argue that the trial court erred by adjudicating

Kenneth neglected solely on the basis of unexplained injuries sustained by his half-

brother.

 We consider Respondents’ arguments in turn.3

 A. Standard of Review

 We review an adjudication under N.C. Gen. Stat. § 7B-807 (2019) to determine

whether the trial court’s findings of fact are supported by “clear and convincing

competent evidence” and whether the court’s findings support its conclusions of law.

 3 Respondent-Mother and Respondent-Father filed separate briefs, but many of their
arguments on appeal are similar so we consider them together. We have noted where their arguments
differ throughout this opinion.

 -9-
 IN RE K.L. AND J.A. II

 Opinion of the Court

In re Helms, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). The “clear and

convincing” standard “is greater than the preponderance of the evidence standard

required in most civil cases.” In re Smith, 146 N.C. App. 302, 304, 552 S.E.2d 184,

186 (2001) (citation and marks omitted). Clear and convincing evidence is “evidence

which should fully convince.” Id. (citation and marks omitted). Findings of fact

unchallenged by the appellant are “binding on appeal.” Koufman v. Koufman, 330

N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Labels are not dispositive in our review of a

lower court’s factual findings and conclusions of law. See State v. Sparks, 362 N.C.

181, 185, 657 S.E.2d 655, 658 (2008) (“[F]indings of fact which are essentially

conclusions of law will be treated as such on appeal.”) (internal marks and citation

omitted).

 Whether a child is abused or neglected is a conclusion of law, In re Ellis, 135

N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999), and we review a trial court’s

conclusions of law de novo, In re J.S.L., 177 N.C. App. 151, 154, 628 S.E.2d 387, 389

(2006). We also review the question of whether the trial court had subject matter

jurisdiction over the action de novo. In re J.A.P., 189 N.C. App. 683, 685, 659 S.E.2d

14, 16 (2008). Under a de novo review, this Court “considers the matter anew and

freely substitutes its own judgment for that of the lower tribunal.” In re A.K.D., 227

N.C. App. 58, 60, 745 S.E.2d 7, 8 (2013) (citation omitted).

 B. Adjudication of Joseph as Abused

 - 10 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 Respondents first argue that the trial court erred in adjudicating Joseph

abused. We agree.

 i. Findings of Fact Regarding Abuse

 Respondents argue that the trial court erred in adjudicating Joseph abused

because several of the trial court’s findings of fact are not supported by clear and

convincing evidence. Respondents both challenge findings of fact 28 and 42,

Respondent-Father challenges findings 17 and 18, and Respondent-Mother further

challenges finding 23.

 These challenged findings (or pertinent portions thereof) state:

 17. . . . The mother reported that [Joseph] had been
 in her or his father’s exclusive care from the evening of May
 24, 2018 until the morning of May 29, 2018. . . .

 18. . . . The child was not with the sitter during the
 evening of May 24, 2018 through the morning of May 29,
 2018. . . .

 ...

 23. While providing history to Dr. Terrell, Father
 describes several times that Mother was in the kitchen and
 came right into the living room after [Joseph] reportedly
 fell from the couch. . . .

 ...

 28. According to Dr. Adkins, [Joseph]’s Vitamin D
 deficiency is consistent with a diagnosis of Vitamin D
 deficiency without evidence of Rickets. At trial, Dr. Adkins
 confirmed that [Joseph] does not have evidence of Rickets.
 [Joseph]’s evaluated [sic] PTH and parathyroid hormone

 - 11 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 are explained by his low Vitamin D level. According to Dr.
 Adkins, [Joseph]’s Calcium and Phosphorous are normal.
 Dr. Adkins opined that [Joseph]’s metaphyseal fractures
 are likely not related to his Vitamin D level and his long
 bones are not at increased risk of fractures.

 ...

 42. The Court finds that these (6) fractures occurred
 when [Joseph] was in the sole care of his two parents on
 May 28, 2018 and that these injuries were not from a fall.
 [Joseph] suffered non-accidental trauma based on all the
 medical documentation.

 As to findings 17 and 18, Respondent-Father argues that the evidence shows

Joseph was not in Respondents’ exclusive care from 24 May 2018 to the morning of

29 May 2018, but rather clear and convincing evidence established that Joseph was

with the babysitter on 25 May 2018 and was held by family members on 26 and 27

May 2018. We agree with Respondent-Father. The record demonstrates that Joseph

was in the care of his babysitter for portions of 24 and 25 May 2018. Further, while

Respondent-Mother testified that she and Respondent-Father were watching Joseph

the whole weekend, she also noted that Joseph was held by family members at several

family events on the weekend of 26 to 27 May 2018. Accordingly, we hold that both

findings 17 and 18 are not supported by clear and convincing evidence insomuch as

Joseph was not in Respondents’ exclusive care from 24 May 2018 to 27 May 2018, and

we are not bound by that portion of either finding.

 - 12 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 Respondent-Mother next challenges finding 23, arguing Respondent-Father

told Dr. Terrell that Respondent-Mother was in the kitchen or came into the living

room after Joseph’s fall from the couch. Though Respondent-Mother is correct, we

hold that any error here is immaterial given that the record establishes the salient

point: Respondent-Mother was not in the room when Joseph fell from the couch.

 As to finding of fact 28, Respondents challenge this portion of that finding:

“According to Dr. Adkins, [Joseph]’s Vitamin D deficiency is consistent with a

diagnosis of Vitamin D deficiency without evidence of Rickets.” Though she did not

use these exact words, Dr. Adkins did testify that Joseph did not have rickets, but he

was Vitamin D deficient. This finding thus is a fair summation of Dr. Adkins’s

testimony.

 Finally, Respondents argue that finding of fact 42 is not supported by clear and

convincing evidence in finding that Joseph was in the sole care of his parents when

injured on 28 May 2018 and that he suffered “non-accidental trauma.” We agree in

part. Dr. Terrell testified that in her opinion, it was “highly probable” Joseph’s

injuries were caused by non-accidental trauma and not a fall from the couch. Dr.

Terrell also testified Joseph’s injuries occurred around when he became symptomatic,

which was “on or around 28 May 2018[,]” not on 28 May 2018. Accordingly, clear and

convincing evidence supports that Joseph suffered non-accidental trauma that was

not from a fall. But there is no clear and convincing evidence that the fractures

 - 13 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

occurred when Joseph was in the sole care of his parents on 28 May 2018, and, thus,

we are not bound by that portion of finding 42.

 ii. Conclusion of Law Regarding Abuse

 Respondents next argue that the trial court erred as a matter of law by

adjudicating Joseph abused where there was no evidence—aside from Joseph’s

unexplained injuries—to support the trial court’s conclusion.

 An abused juvenile is defined, in pertinent part, as one whose parent,

guardian, custodian, or caretaker “[i]nflicts or allows to be inflicted upon the juvenile

a serious physical injury by other than accidental means[.]” N.C. Gen. Stat. § 7B-

101(1) (2019). “This Court has previously upheld adjudications of abuse where a child

sustains non-accidental injuries, even where the injuries were unexplained[,]” where

clear and convincing evidence supported the inference that the respondent-parents

inflicted the child’s injuries or allowed them to be inflicted. In re J.M., 255 N.C. App.

483, 495, 804 S.E.2d 830, 838-39 (2017). While “the determinative factors [in a

neglect proceeding] are the circumstances and conditions surrounding the child, not

the fault or culpability of the parent[,]” In re Montgomery, 311 N.C. 101, 109, 316

S.E.2d 246, 252 (1984), the same is not true in an abuse proceeding, see N.C. Gen.

Stat. § 7B-101(1) (defining an “abused juvenile” as one “whose parent, guardian,

custodian, or caretaker: (a) [i]nflicts or allows to be inflicted . . . (b) creates or allows

to be created . . . (c) uses or allows to be used . . .”) (emphasis added).

 - 14 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 For example, in In re R.S., 254 N.C. App. 678, 683, 802 S.E.2d 169, 172 (2017),

this Court upheld the trial court’s abuse adjudication where, in addition to the

infant’s “serious, yet unexplained injuries,” the infant was diagnosed with failure to

thrive (weighing less than he did at birth), and a skeletal survey revealed prior,

healing fractures on the infant. Testimony established that the infant’s injuries

“would have resulted in a significant amount of bleeding” such that it was “not

credible” that the respondent-parents claimed not to have observed any bleeding or

pain associated with the injury. Id. at 681, 802 S.E.2d at 171. We held that “the trial

court’s finding that the parents were responsible for those injuries was entirely

appropriate.” Id. at 683, 802 S.E.2d at 172.

 And in In re C.M., 198 N.C. App. 53, 678 S.E.2d 794 (2009), this Court affirmed

an abuse adjudication where the child suffered from an unexplained subdural

hematoma and further examination revealed bruises and marks on his back and chin.

Id. at 58, 678 S.E.2d at 797. Additionally, witness testimony established the

respondent-father had hit the child on the head earlier that day, and there were also

confirmed instances of domestic violence in the home. Id. at 62, 678 S.E.2d at 799.

 In In re J.M., we again affirmed an abuse adjudication where a two-month-old

was observed with “marks” on his neck. 255 N.C. App. at 485, 804 S.E.2d at 832. A

subsequent skeletal survey revealed “healing fractures to his ribs, tibia, and fibula;

ear and tongue bruising; subconjunctival hemorrhages; and excoriation under the

 - 15 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

chin.” Id. The mother also revealed to DSS that the respondent-father had punched

the son in the stomach, excessively disciplined the daughter, engaged in domestic

violence in front of the children, and smoked marijuana in the presence of the

children. Id. Though the exact cause and manner of the infant’s injuries were

unknown, “[t]he binding findings of fact establish[ed] that the son sustained multiple

non-accidental injuries and [the r]espondent-[f]ather was responsible for the

injuries.” Id. at 495, 804 S.E.2d at 838.

 In each of these cases, though the exact cause of the child’s injury was unclear,

the trial court’s findings of fact—or other evidence in the record—supported the

inference that the respondent-parents were responsible for the unexplained injury.

While “[t]he caselaw does not require a pattern of abuse or the presence of risk

factors[,]” we do require clear and convincing evidence to support this inference. In

re L.Z.A., 249 N.C. App. 628, 637, 792 S.E.2d 160, 168 (2016) (affirming abuse

adjudication where the infant sustained an unexplained bilateral midline shift, brain

bleeding, and a skull fracture, the infant’s skeletal survey revealed a one- to three-

week-old healing fracture on her upper arm, and there was a delay in seeking medical

treatment for the child). Such evidence can serve as the basis for findings of fact that,

in turn, sufficiently support the conclusion that the respondent-parents inflicted or

allowed the infliction of the injury at issue.

 Here, the trial court’s binding findings of fact established that

 - 16 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 10. On or about May 30, 2018, After Hours Durham
DSS CPS Social Worker Courtney Munroe (“Social Worker
Munroe”) conducted a hospital visit to initiate an
assessment/CPS investigation in reference to [Joseph] and
the family. Social Worker Munroe spoke with the mother,
[], and observed the child, [Joseph]. [Respondent-Mother]
stated she did not know how the child’s leg was fractured.
[Respondent-Mother] stated she had noticed that the child
was not putting any pressure on his leg and took him to his
pediatrician where it was confirmed that [Joseph] had a
fracture in his left leg. The pediatrician recommended that
the mother take the child to the UNC ED for further
evaluation. However, the mother took him to DUMC
immediately due to the closer proximity of DUMC. The
medical providers at DUMC ED reported that the
explanation given by the respondent parents was
inconsistent with the injuries [Joseph] sustained. Due to
concern for nonaccidental trauma, CANMEC was
consulted.

 11. . . . That same evening on May 30, 2018, Social
Worker Munroe interviewed [Respondent-Father] at the
family home . . . . Social Worker Munroe spoke with
[Respondent-Father] who stated that . . . the child,
[Joseph], rolled off the couch and fell to the floor; but he
appeared fine afterwards. [Respondent-Father] reported
that no family members were present in the room when
[Joseph] rolled off the couch. . . . [Respondent-Father] also
stated that he did not actually see the child roll off the
couch but found him on the floor after placing [Joseph] on
the couch. Social Worker Munroe observed that the couch
was about 18 inches high and there was carpeted floor
underneath it.

 12. Social Worker Munroe also interviewed the
minor child [Kenneth] (8 years old) who stated he did not
see his baby brother fall nor did he know how he was hurt.
Social Worker Munroe asked [Kenneth] how [Respondent-
Father] disciplined him. [Kenneth] responded that
[Respondent-Father] talks to him and tells him what to do

 - 17 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

or sometimes makes him write sentences. [Kenneth]
denied that [Respondent-Father] ever hit him. Social
Worker Munroe also asked [Kenneth] how his mother
disciplined him. [Kenneth] stated that his mother takes
his phone away or does not allow him to play games or
watch TV. [Kenneth] also reported that he was happy at
his mother’s home. Social Worker Munroe did not observe
any bruises, marks, or physical injuries to [Kenneth]. . . .

 13. Durham DSS CPS Social Worker Shekinah
Taylor was immediately assigned this case. On May 31,
2018, Social Worker Taylor contacted the family and
requested a child and family team (“CFT”) meeting to be
held on June 1, 2019 [sic] to further discuss the CPS case
and to develop a plan with the family for the children.
[Respondent-Father] and [Respondent-Mother] attended
the CFT and discuss [sic] planning for the children [Joseph
and Kenneth]. Both [Respondent-Mother] and
[Respondent-Father] have been forthcoming with the
investigation and asking questions with hopes of finding
out what could have caused these injuries in their son,
[Joseph]. Durham DSS expressed their concerns for the
safety of the children, especially [Joseph] who suffered
metaphyseal fractures. . . .

 ...

 17. . . . The mother reported to physician at DUMC
ED that after noticing a change in [Joseph]’s behavior in
the early morning of May 29, 2019 [sic], the mother took
the child to his pediatrician at Chapel Hill Pediatrics on
May 30, 2019 [sic]. During the CPS investigation, the
mother shared that she asked [Joseph]’s father what
happened, and he had provided the same account, that the
child rolled off the couch and hit the floor. According to the
father, the child did not cry after falling off the couch.
Therefore, he thought that the child was okay. The mother
also stated that she was upstairs with her (8-year-old son)
[Kenneth] when [Joseph] fell off the couch.

 - 18 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 18. On or about May 30, 2018, the mother also
informed the DUMC ED doctor [] that other than [Joseph]’s
left leg, he appeared completely normal and that she
almost did not take him to the doctor. However, the mother
did take him to the doctor because she concerned. The
mother mentioned that the child started going to a sitter
(Shonda Collins, a family friend of over 40 years) when the
mother went back to work about a week ago. The child was
with the sitter . . . on May 29, 2018 and again on May 30,
2018 for a few hours in the daytime. The mother stated
that she called the sitter on May 29, 2018 and on May 30,
2018 to check on [Joseph]’s movement on his left leg. The
mother reported that the sitter did not notice any issues
with [Joseph]. The mother reported that she was
concerned about [Joseph]’s leg, so she scheduled a doctor
appointment for May 30, 2018 with his pediatrician at
Chapel Hill Pediatrics.

 19. At DUMC ED, additional x-rays were performed
on [Joseph] as protocol. There were no visual [sic] bruises
or marks on [Joseph]’s body when he presented at the ED
on May 30, 2018. That same night (May 30, 2018), [Joseph]
was seen by several physicians[.] . . .

 20. [Joseph] is a previously healthy three months
[sic] old male who was referred for consultation by Dr.
Bordley of Pediatric ED Service for evaluation of broken
bones. Due to concern for possible maltreatment the
following testing was recommended: a skeletal survey,
dilated eye exam, head CT, screening abdominal injury
labs (AST/ALT/Lipase), as well as labs to assess bone
health (Vitamin D, PTH, Ca, Phos, Alk Phos). . . .

 21. On May 31, 2018, Dr. Terrell introduced herself
to [Respondent-Mother] as a Pediatrician on Duke
Hospital’s Child Abuse Consult Team. Dr. Terrell
explained that Pediatric ED and Trauma Surgery Teams
requested her consult to help assess [Joseph] given the
injuries. Dr. Terrell explained that she provides medical
evaluations regarding injury etiology. The Mother

 - 19 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

verbalized understanding and agreement and agreed to the
evaluation. During the medical evaluation, the mother
provided additional information to Dr. Terrell. Mother
explained that their car was rear-ended in April 2018.
Mother reported that [Joseph] was strapped in the car seat
and the car seat was strapped in the car. . . . Mother called
[Joseph]’s doctor after the accident. Mother reported that
[Joseph] seemed fine; therefore, the doctor did not think
that the child, [Joseph] needed to come in. Mother asked
Dr. Terrell if [Joseph]’s fractures could have come from
changing diapers. Dr. Terrell informed the mother that
changing diapers would not cause these fractures. Dr.
Terrell also stated that the automobile accident that the
mother described was too long ago in time to be considered
the cause of [Joseph]’s fractures. It would take significant
force to cause this type of fracture with a closer time
proximity. . . .

 ...

 25. When asked about any risk factors and
exposures to domestic violence in the home [by Dr. Terrell],
the mother reported that [Joseph] has not witnessed
domestic violence (“DV”) first hand between caregivers or
family members. Mother was asked with the father out of
the room if there have been concern [sic] of DV or if she
ever worries about her safety. Mother denied. Mother has
previous marijuana use. [Joseph]’s meconium was positive
for marijuana at birth. There is a history of mental illness
involving family member(s) or caregiver(s). There is no
history of criminal arrest or legal charges against family
member(s) or caregiver(s). Dr. Terrell also reviewed family
medical history with the mother and father and there was
no significant medical history. Dr. Terrell also reviewed all
the available lab work and noted that the dilated eye exam,
head CT, screening abdominal injury labs
(AST/ALT/Lipase) were within normal limits.

 26. . . . According to [Respondent-Mother]’s
pregnancy/birth history for [Joseph], [Joseph]’s fetal

 - 20 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

movement and amniotic fluid volume were normal.
Ultrasound examination during the pregnancy were
normal. The mother took the following medications during
pregnancy[:] Zoloft, Klonopin, Trazodone with a history of
anxiety and depression. The mother was smoking
marijuana every day before she found out about the
pregnancy (first trimester). At birth, [Joseph]’s meconium
drug screen was positive for marijuana (“THC”). [Joseph]
was born at full-term (40 weeks and 3 days) by repeat C-
section. According to medical records, labor was
uncomplicated. There were perinatal issues of concern of
withdrawal in view of the mother’s drug use of THC.
[Joseph] had a stuffy nose after delivery, but this resolved
after 2 days. [Joseph] was discharged home with his
mother at 3 days old.

 ...

 29. On May 31, 2018, Dr. Gary Schooler, Pediatrics
Radiologist, was also consulted regarding [Joseph]’s
injuries. Dr. Schooler reviewed multiple prior left lower
extremity x-rays (radiographs) completed on [Joseph]
while at DUMC. Dr. Schooler also reviewed [Joseph]’s
standard skeletal survey of a total of 20 images. There
were no fractures identified with the calvarium (skull),
visualized facial bones or spine and there was no evidence
of static listhesis (joint instability); however, Dr. Schooler
noted that there was a metaphyseal corner fracture (classic
metaphyseal lesion) to [Joseph]’s right leg, highly
suggestive of nonaccidental trauma. Findings and
impressions regarding the right proximal tibial
metaphyseal fracture were discussed with Dr. Terrell in
the late evening of May 31, 2018. [Joseph] was found to
have three metaphyseal corner fractures which are known
as “classic metaphyseal lesions.” . . .

 ...

 37. On June 28, 2018, [Joseph] had genetic labs
drawn. [Joseph]’s genetic labs were not different from his

 - 21 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

last genetic lab results from admission to DUMC from May
31, 2018 through June 1, 2018. The genetic/metabolic test
results remain the same: negative for bone disorder.
According to the Pediatric Endocrinology Team, [Joseph]’s
Vitamin D insufficiency did not contribute to his multiple
fractures and does not contradict the diagnosis of child
abuse.

 38. Based on the history provided by the parents,
medical examinations, genetic testing, labs, x-rays, and
skeletal surveys, Dr. Schooler, Dr. Terrell and Dr. Adkins
agree along with other physicians consulted in this case
that [Joseph]’s fractures are highly suspect for
nonaccidental trauma.

 39. The Court gives great weight to the fact that the
parents could not provide history that could explain the six
(6) fractures that [Joseph] sustained. The Court is
concerned that the types of fractures that [Joseph]
sustained were the kinds that are created by twisting,
pulling, shearing, or torsion. It takes a significant amount
of force to create the types of fractures that [Joseph]
endured.

 40. According to Dr. Terrell and the testimony the
Court heard, May 28, 2018 was the day that [Joseph]
became symptomatic. At the time that he became
symptomatic or it became evident that he was not placing
weight on his left leg, he was in the care of the two persons
that are to make sure he is protected which are his mother
and father.

 ...

 42. The Court finds that these six (6) fractures
occurred when [Joseph] was in the sole care of his two
parents on May 28, 2018 and that these injuries were not
from a fall. [Joseph] suffered non-accidental trauma based
on all the medical documentation[.]

 - 22 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 Unlike those instances in which this Court has upheld an abuse adjudication

based on unexplained injuries, the trial court’s detailed findings of fact in this case

do not sufficiently support the conclusion that Respondents inflicted or allowed the

infliction of Joseph’s injuries. Doctors noted in medical records, which were admitted

into evidence and fully incorporated into the adjudication order, that Joseph was a

healthy, well-cared-for, three-month-old baby. Cf. In re R.S., 254 N.C. App. at 679,

802 S.E.2d at 170 (noting child was “diagnosed with failure to thrive” and weighed

less than he did at birth). Both DSS and the doctors noted that Respondents were at

all times forthcoming and cooperative in the ongoing investigation and Joseph’s

medical care and did not delay in seeking prompt medical attention for Joseph. Cf.

id. at 682, 802 S.E.2d at 172 (“[Respondents] delayed meetings between the social

worker and the [older] children, delayed and limited medical tests, and appear to

have omitted information.”); cf. In re Y.Y.E.T., 205 N.C. App. 120, 122, 695 S.E.2d

517, 519 (2010) (noting two-day delay “in the parents’ getting the child to the

hospital”). In fact, Joseph’s injuries manifested themselves so subtly that they were

not noticed by his babysitter and initially escaped notice by his pediatrician and were

diagnosed due to Respondent-Mother’s persistence in seeking X-rays, which, in turn,

revealed fractures in both his symptomatic and asymptomatic leg. And subsequent

testing did not reveal any prior injuries, marks, bruising, or medical concerns with

Joseph. Cf. In re J.M., 255 N.C. App. at 485, 804 S.E.2d at 832 (skeletal survey

 - 23 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

revealed healing fractures to infant’s ribs, tibia, fibula; ear and tongue bruising;

subconjunctival hemorrhages; and excoriation under the chin). Finally, as noted

above, the evidence does not support the finding that Joseph was in Respondents’

exclusive care when his injuries occurred. Cf. In re Y.Y.E.T., 205 N.C. App. at 127,

695 S.E.2d at 522 (noting unchallenged findings that the child was in the exclusive

care of the respondent-parents at the time of the injuries).

 The broader record raises no red flags about the family. There was no ongoing

substance abuse nor domestic violence in the home, cf. In re J.M., 255 N.C. App. at

485, 804 S.E.2d at 832, and Respondents had no prior history with DSS, cf. In re K.B.,

253 N.C. App. 423, 424-25, 801 S.E.2d 160, 162 (2017). Moreover, Kenneth told DSS

that he was unaware of how Joseph was hurt, Respondents never punished him with

violence, and he provided examples of appropriate discipline, including by talking

with him and taking away his privileges. And neither Kenneth nor Joseph ever

exhibited bruises or marks on their bodies.

 The trial court was rightly concerned that Respondents were unable to explain

Joseph’s fractures. But, that alone, as a matter of law, cannot support the trial court’s

conclusion that Respondents were responsible for Joseph’s injuries. There is nothing

to bridge the evidentiary gap between the unexplained injuries here and the

conclusion that Respondents inflicted them, and, in fact, much of the evidence is in

 - 24 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

tension with that conclusion.4 We therefore reverse the trial court’s order

adjudicating Joseph abused and remand to the trial court for further proceedings

consistent with this opinion.

 C. Adjudication of Joseph as Neglected

 Respondents next argue that the trial court erred in adjudicating Joseph

neglected because the petition filed by DSS only alleged abuse. We agree.

 i. Preservation

 We first address DSS’s argument that this issue is not preserved for our

review.

 “The pleading in an abuse, neglect, or dependency action is the petition[,]” N.C.

Gen. Stat. § 7B-401 (2019), and must contain “allegations of facts sufficient to invoke

 4 We do not gainsay the nature of the challenges and concerns DSS faces when dealing with
allegations of abuse in pre-mobile infants who are completely dependent on their caregivers and
unable to report what has happened to them. In instances such as these, DSS is charged with taking
quick and decisive action to assess and address unexplained trauma. Nor do we take lightly the risk
that parents who are witness to or perpetrators of child abuse or neglect can collaborate to frustrate
investigation by DSS. See, e.g., In re J.C.M.J.C, ___ N.C. App. ___, ___, 834 S.E.2d 670, 679 (2019)
(“We recognize [r]espondents’ actions frustrated CCDHS’s ability to gather evidence in this case.”).
 That being said, a review of the record before us indicates that DSS engaged in only a limited
investigation of how Joseph sustained his injuries. According to Respondents’ and Social Worker
Taylor’s testimony, Respondents were interviewed once by DSS regarding Joseph’s injuries: the night
he was admitted to the ER. (The report on that interview is not a part of our record.) Kenneth was
also only interviewed once about Joseph’s injuries, a discussion that, based on the record before us,
did not touch on his physical interactions with his little brother. Neither Joseph’s babysitter nor family
members who had spent the weekend with him were interviewed. Instead, the causal link between
Respondents and Joseph’s injuries was based strictly on medical opinions about the serious nature of
the fractures and, relatedly, that they were “highly probable” to have resulted from abuse. In this
instance, given that there is no affirmative evidence in the record giving rise to even an inference that
Respondents inflicted or allowed the infliction of a serious injury upon Joseph, these opinions are
insufficient to support an abuse adjudication.

 - 25 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

jurisdiction over the juvenile[,]” id. § 7B-402(a). If the allegations are insufficient to

put the party on notice as to which alleged grounds are at issue, then the trial court

lacks subject matter jurisdiction over the action. See In re K.B., 253 N.C. App. 423,

427, 801 S.E.2d 160, 163 (2017); In re D.C., 183 N.C. App. 344, 349, 644 S.E.2d 640,

643 (2007). Since it is well established that “a question of jurisdiction may be

addressed by this Court at any time, sua sponte, regardless of whether [the] parties

properly preserved it for appellate review[,]” Respondents’ argument is properly

before us. In re C.M.H., 187 N.C. App. 807, 808, 653 S.E.2d 929, 930 (2007) (internal

marks and citation omitted).

 ii. Merits

 Only “those conditions alleged in the juvenile petition” may “be considered,

proved, and adjudicated[.]” In re D.C., 183 N.C. App. at 349, 644 S.E.2d at 643. “[I]f

the specific factual allegations of the petition are sufficient to put the respondent on

notice as to each alleged ground for adjudication, the petition will be adequate.” Id.

at 350, 644 S.E.2d at 643. This is so even if DSS fails to “check the [correct] box” on

the petition. In re K.B., 253 N.C. App. at 427, 801 S.E.2d at 163-64.

 While it is certainly the better practice for the petitioner to
 “check” the appropriate box on the petition for each ground
 for adjudication, if the specific factual allegations of the
 petition are sufficient to put the respondent on notice as to
 each alleged ground for adjudication, the petition will be
 adequate.

 - 26 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

In re D.C., 183 N.C. App. at 350, 644 S.E.2d at 643. However, if the correct box is not

checked and the factual allegations do not clearly allege the separate claim, then that

adjudication must be reversed. Id.

 In In re K.B., we affirmed the trial court’s adjudication of an abused, neglected,

and dependent juvenile despite the fact that the petition only explicitly alleged that

the child was abused and neglected. 253 N.C. App. at 426, 801 S.E.2d at 163. Though

“DSS did not ‘check the box’ alleging dependency” on the petition, “[t]he allegations

attached to the petition [] were sufficient to put respondent-mother on notice that

dependency would be at issue during the adjudication hearing” because they

“encompass[ed] the language reflected in the statutory definition of dependency[.]”

Id. at 427-28, 801 S.E.2d at 163-64 (petition alleged specifically “that respondent-

mother failed to provide for [the child]’s care or supervision and lacks an appropriate

alternative child care arrangement.” (internal marks omitted)). Moreover, our Court

noted that an order entering stipulations for adjudication stated in the first sentence

that the petition alleged abuse, neglect, and dependency. Id. at 428, 801 S.E.2d at

164.

 On the other hand, in In re D.C., this Court reversed the trial court’s neglect

adjudication where DSS alleged dependency in its juvenile petition but proceeded on

the theory of neglect at adjudication. 183 N.C. App. at 349, 644 S.E.2d at 643. We

held that the “specific factual allegations” attached to the petition “were insufficient

 - 27 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

to put [the] respondent on notice that both dependency and neglect of C.C. would be

at issue during the adjudication hearing.” Id. at 350, 644 S.E.2d at 643 (emphasis in

original). The attachment alleged that the respondent: “(1) received sporadic

prenatal care for C.C., (2) refused to divulge the identity of C.C.’s father, (3) does not

possess a crib, diapers, clothes, or formula for C.C., and (4) is incapable of providing

care for a newborn.” Id. We held that “[t]hese minimal allegations . . . while

supporting the claim of dependency, did not clearly allege the separate claim of

neglect.”5 Id.

 Here, the juvenile petition that DSS filed alleged only that Joseph was an

abused juvenile. The abuse box on the petition alone was checked and all allegations

were found in this section of the form. Further, the petition tracked the language of

the abuse statute, alleging “that the juvenile’s parent, guardian, custodian, or

caretaker: has inflicted or allowed to be inflicted on the juvenile a serious physical

 5 Under N.C. Gen. Stat. § 7B-101(15) (2019), a “neglected juvenile” is

 Any juvenile less than 18 years of age . . . (ii) whose parent, guardian,
 custodian, or caretaker does not provide proper care, supervision, or
 discipline; or who has been abandoned; or who is not provided
 necessary medical care; or who is not provided necessary remedial care;
 or who lives in an environment injurious to the juvenile’s welfare; or
 the custody of whom has been unlawfully transferred under G.S. 14-
 321.2; or who has been placed for care or adoption in violation of law. .
 ..

 Unlike in In re K.B., the factual allegations in In re D.C. did not encompass the language in
the statutory definition of neglect such that the respondent-parents had no notice that neglect would
be at issue in the proceedings.

 - 28 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

injury by other than accidental means.” The only facts that DSS alleged in support

of the petition were that

 [t]hree month old [Joseph] has two fracture [sic] in the left
 leg and one in the right leg. The mother and father can not
 [sic] explain how the injury occurred. The father stated the
 child fell of the couch, but the doctors state the injuries are
 not consistent with the story.

 Not only did DSS fail to “check the box” for “neglect” on the form petition, but,

as in In re D.C., the factual allegations here do not “clearly allege the separate claim

of neglect.” 183 N.C. App. at 350, 644 S.E.2d at 643 (emphasis added). There is no

reference to “neglect” in the allegations, nor do they encompass language from the

statutory definition of neglect. Additionally, the arguments of counsel for

Respondent-Mother, Respondent-Father, and the Guardian Ad Litem in the

adjudicatory phase of the proceedings focused only on whether DSS had proved by

clear and convincing evidence that Joseph was abused. And when the trial court

orally announced its judgment on 20 December 2018, it adjudicated Joseph abused—

not abused and neglected. While the trial court’s written order, entered over four

months later, adjudicated Joseph abused and neglected, the record indicates that the

Respondents did not have notice the issue of neglect was before the trial court.

 We therefore reverse that portion of the trial court’s order adjudicating Joseph

neglected.

 D. Adjudication of Kenneth as Neglected

 - 29 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 Finally, Respondents argue that the trial court erred in adjudicating Kenneth

neglected. We agree.

 i. Findings of Fact Regarding Neglect

 Respondents first challenge finding of fact 9 as not supported by clear and

convincing evidence. Respondent-Mother separately challenges finding of fact 43.

Those findings are:

 9. The child, [Kenneth], lives in the same home in
 which the injures occurred with his younger sibling,
 [Joseph]. [Kenneth] was residing with his mother and
 mother’s live-in boyfriend [Respondent-Father] and
 younger sibling, [Joseph] . . .

 ...

 43. Moreover, the parents continue to endorse that
 they have no knowledge of what could have caused the six
 fractures in the infant, [Joseph]. Because of their lack of
 knowledge, the Court finds that the home of the parents
 creates an injurious environment to the welfare of
 [Kenneth] and continuous risk of harm to [Kenneth] at the
 time. [Kenneth] was living and present in the home when
 [Joseph] became symptomatic.

 As to finding of fact 9, Respondents argue that no clear and convincing evidence

established exactly where Joseph’s injuries occurred, much less that they occurred in

the home. While doctors opined that Joseph’s injuries occurred on or about 28 May

2018, the record contains no evidence from witnesses, expert or otherwise, about

where Respondents, Kenneth, or Joseph were on 28 May 2018. The only information

regarding that day came from Respondent-Mother and Respondent-Father, who told

 - 30 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

Dr. Terrell that Joseph rolled off the couch around 6:00 p.m. However, as the expert

witnesses repeatedly testified and the trial court ultimately found, Joseph’s injuries

were not consistent with a fall from the couch, so that evidence cannot support this

finding. Given this record, the trial court’s finding here is unsupported by the

evidence to the extent it indicates that the injury occurred in the family’s home.

 Respondent-Mother also challenges finding of fact 43. While there is clear and

convincing evidence in the record to support the trial court’s finding that Respondents

“continue to endorse that they have no knowledge of what could have caused the six

fractures” in Joseph, the remainder of this finding is properly labeled a conclusion of

law, and we consider it as such below.

 ii. Conclusion of Law Regarding Neglect

 “In determining whether a juvenile is a neglected juvenile, it is relevant

whether that juvenile lives . . . in a home where another juvenile has been subjected

to abuse or neglect by an adult who regularly lives in the home.” N.C. Gen. Stat.

§ 7B-101(15) (2019). “[T]he neglect statute affords the trial judge some discretion in

determining the weight to be given [] evidence” of prior abuse or neglect. In re

McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999) (internal marks and

citation omitted). “[T]he fact of prior abuse, standing alone,” however, “is not

sufficient to support an adjudication of neglect.” In re N.G., 186 N.C. App. 1, 9, 650

S.E.2d 45, 51 (2007). “Instead, this Court has generally required the presence of other

 - 31 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

factors to suggest that the neglect or abuse will be repeated.” In re J.C.B., 233 N.C.

App. 641, 644, 757 S.E.2d 487, 489 (2014); see also In re J.A.M., 372 N.C. 1, 10, 822

S.E.2d 693, 699 (2019) (explaining that the trial court’s findings must show that the

juvenile “presently face[s] substantial risk in [his or] her living environment.”).6

 Other factors that suggest that the neglect or abuse will be repeated include

the presence of domestic violence in the home and current and ongoing substance

abuse issues, see In re D.B.J., 197 N.C. App. 752, 755-56, 678 S.E.2d 778, 781 (2009)

(affirming adjudication of D.B.J. as neglected where “parents engaged in acts of

domestic violence in D.B.J.’s presence,” the mother “never ceased contact with [the]

[r]espondent[,]” and the “[m]other has abused alcohol and/or controlled substances”),

unwillingness to engage in recommended services or work with or communicate with

DSS regarding the prior abuse or neglect, see In re N.G., 186 N.C. App. 1, 9-10, 650

S.E.2d 45, 51 (2007), aff’d per curiam, 362 N.C. 229, 657 S.E.2d 355 (2008)

(emphasizing the respondent-parents’ unwillingness to work with DSS in prior case

in upholding neglect adjudication), and failing to accept responsibility for prior

adjudications, see In re J.A.M., 372 N.C. at 7, 822 S.E.2d at 697 (affirming neglect

 6 We note that in neglect cases involving newborns, “the decision of the trial court must of
necessity be predictive in nature, as the trial court must assess whether there is substantial risk of
future abuse or neglect of a child based on the historical facts of the case.” In re McLean, 135 N.C.
App. at 396, 521 S.E.2d at 127; see also In re A.B., 179 N.C. App. 605, 611, 635 S.E.2d 11, 16 (2006)
(“To hold that a newborn child must be physically placed in the home where another child was abused
or neglected would subject the newborn to substantial risk, contrary to the purposes of the statute.”).
A trial court is not limited to forecasting, however, in instances such as the current controversy in
which Kenneth lived in the house where Joseph was allegedly abused. Accordingly, our case law
demands more by way of evidence here.

 - 32 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

where respondent-mother “(1) continued to fail to acknowledge her role in her rights

being terminated to her six other children, (2) denied the need for any services for

J.A.M.’s case, and (3) became involved with the father, who had engaged in domestic

violence even though domestic violence was one of the reasons her children were

removed from her home”) (internal marks omitted).

 In In re J.C.B., this Court reversed the trial court’s adjudication of J.C.B.,

C.R.R., and H.F.R. as neglected where the petitions alleged that the juveniles lived

in an environment injurious to their welfare because they resided in a home where

another juvenile, R.R.N., allegedly had been sexually abused by the respondent-

father. 233 N.C. App. at 642, 757 S.E.2d at 488. “[A]ssum[ing] arguendo that

respondent-father abused R.R.N.” our Court determined that “this fact alone [did] not

support a conclusion that J.C.B., C.R.R., and H.F.R. were neglected” because the trial

court failed to make any findings of fact that the juveniles “were either abused

themselves or were aware of [the] respondent-father’s inappropriate relationship

with R.R.N.” Id. at 644, 757 S.E.2d at 489. Furthermore, “the trial court failed to

make any findings of fact regarding other factors that would support a conclusion

that the abuse would be repeated[,]” which warranted reversal of the trial court’s

adjudications of neglect. Id. at 644-45, 757 S.E.2d at 489-90.

 Our review of the record and the trial court’s findings of fact similarly reveals

that the trial court’s adjudication of Kenneth as neglected is predicated on its

 - 33 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

adjudication of Joseph as abused. The requisite additional factors supporting an

adjudication of neglect are absent in the case at hand.

 We first note that the majority of the trial court’s adjudicatory findings of fact

address Joseph’s fractures and the fact that Respondents did not know how Joseph

sustained his injuries. And of the nine findings of fact which mention Kenneth, only

three specifically concern him:

 9. The child, [Kenneth], lives in the same home in
 which the injures occurred with his younger sibling,
 [Joseph]. [Kenneth] was residing with his mother and
 mother’s live-in boyfriend [Respondent-Father] and
 younger sibling, [Joseph] . . .

 ...

 12. Social Worker Munroe also interviewed the
 minor child [Kenneth] (8 years old) who stated he did not
 see his baby brother fall nor did he know how he was hurt.
 Social Worker Munroe asked [Kenneth] how [Respondent-
 Father] disciplined him. [Kenneth] responded that
 [Respondent-Father] talks to him and tells him what to do
 or sometimes makes him write sentences. [Kenneth]
 denied that [Respondent-Father] ever hit him. Social
 Worker Munroe also asked [Kenneth] how his mother
 disciplined him. [Kenneth] stated that his mother takes
 his phone away or does not allow him to play games or
 watch TV. [Kenneth] also reported that he was happy at
 his mother’s home. Social Worker Munroe did not observe
 any bruises, marks, or physical injuries to [Kenneth]. . . .

 ...

 43. Moreover, the parents continue to endorse that
 they have no knowledge of what could have caused the six
 fractures in the infant, [Joseph]. Because of their lack of

 - 34 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 knowledge, the Court finds that the home of the parents
 creates an injurious environment to the welfare of
 [Kenneth] and continuous risk of harm to [Kenneth] at the
 time. [Kenneth] was living and present in the home when
 [Joseph] became symptomatic.

 These findings cannot support a conclusion of neglect. First, as noted above,

the record does not support finding of fact 9 as it relates to Joseph’s injuries occurring

in the home. The trial court further found that Kenneth was not abused nor was he

aware of how his brother was injured. See In re J.C.B., 233 N.C. App. at 644, 757

S.E.2d at 489 (holding the same counsels against adjudicating neglect in a sibling).

And the trial court did not make any findings regarding “other factors” that would

show Kenneth faced a “substantial risk” of neglect. See id. Indeed, the trial court

found that Respondents were forthcoming, cooperative, and willing to work with DSS

and doctors, there were no incidents of domestic violence in the home, nor current

and ongoing substance abuse, nor prior DSS involvement. Cf. In re J.A.M., 372 N.C.

at 10, 822 S.E.2d at 699 (present risk factors included denial of services, DV in the

home, and failure to acknowledge circumstances that led to TPR of six other children);

In re D.B.J., 197 N.C. App. at 756, 678 S.E.2d at 781 (DV in the home and ongoing

substance abuse issues); In re McLean, 135 N.C. App. at 396, 521 S.E.2d at 127

(parents not cooperative with social worker, parents did not express concern for

future safety of child, respondent-father—who had been convicted of involuntary

manslaughter of his daughter—provided most of the care for the child).

 - 35 -
 IN RE K.L. AND J.A. II

 Opinion of the Court

 The only finding of fact that attempts to establish a connection between

Joseph’s injuries and any risk to Kenneth is finding of fact 43. However, “lack of

knowledge” of what caused an injury to one child, standing alone, is not sufficient to

support an adjudication of neglect of another child. That is particularly the case

where, as here, the trial court found that Kenneth was properly cared for, disciplined,

supervised, and, by all accounts, happy in Respondents’ home. We therefore reverse

Kenneth’s adjudication and remand to the trial court for further proceedings

consistent with this opinion.

 III. Conclusion

 For the reasons stated above, we reverse the trial court’s order adjudicating

Joseph neglected. We remand to the trial court on the issues of Joseph’s adjudication

as abused and Kenneth’s adjudication as neglected. If necessary, the trial court shall

in its discretion either proceed based on the present record evidence or after receiving

additional evidence and argument. The trial court shall then, only if necessary, enter

a new order making findings of fact and conclusions of law consistent with this

opinion in deciding the legal question or questions remaining before it.

 REVERSED AND REMANDED.

 Judges DILLON and ZACHARY concur.

 - 36 -